LAW OFFICES OF ANTHONY J. POIDMORE
A Professional Law Corporation
Anthony J. Poidmore, Esq. (SBN 51346)
3300 Douglas Blvd., Suite 190
Roseville, CA 95661
Telephone No.: 916-787-1290
FAX No.:       916-787-1293

Attorney for Plaintiff

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOYCE GARDNER, ) | CIV NO.: |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **COMPLAINT FOR DAMAGES** |
| ) | **JURY TRIAL DEMANDED** |
| SHASTA COUNTY, GERALD BENITO, ) | |
| ELIZABETH LESLIE, ANGELA ) | |
| FITZGERALD, AND CAROL GALL, ) | |
| ) | |
| Defendants. ) | |
| ) | |

COMES NOW Plaintiff, JOYCE GARDNER, and complains against Defendants, SHASTA COUNTY, GERALD BENITO, ELIZABETH LESLIE, ANGELA FITZGERALD, AND CAROL GALL, and alleges as follows:

**JURISDICTION**

1. Plaintiff brings action based upon the constitution of the United States, First Amendment and federal statutes including 42 U.S.C. 1983 and this court has jurisdiction pursuant to 28 U.S.C.A. 1351, 1343 and 1367 (a).

2. This action is properly filed in the United States District Court for the Eastern District

of California because defendants reside within this judicial district and Plaintiff's claim arose in this judicial district.

3.  Plaintiff, JOYCE GARDNER, is a resident of the Eastern District and was an employee of Defendant, SHASTA COUNTY (hereinafter "COUNTY") for approximately 15 years until October 4, 2004. Her last position with the COUNTY was in a managerial capacity in the Office of the District Attorney as Program Director for the Shasta County Victim/Witness Assistance Program, which position she held since October of 1999.

4.  Defendant, SHASTA COUNTY, is a governmental entity organized and existing under the laws of the State of California.

5.  Defendant, GERALD BENITO (hereinafter "BENITO"), was an employee of COUNTY at all times herein relevant and, since approximately June of 2001, has been employed in the position of District Attorney for Shasta County. In the position of District Attorney, BENITO was Plaintiff's second level supervisor. Defendant BENITO acted within the course and scope of his employment and agency at all times. Plaintiff sues BENITO in his individual capacity. BENITO is a resident of the Eastern District.

6.  Defendant, ELIZABETH LESLIE (hereinafter "LESLIE"), is, and at all times herein relevant was, an employee of COUNTY who, commencing approximately April of 2004 through the present, was employed in the Office of the District Attorney as the Criminal Program Director. In that position, while Plaintiff was still employed with COUNTY, LESLIE was Plaintiff's immediate supervisor. Defendant LESLIE acted within the course and scope of her employment and agency at all times herein. Plaintiff sues LESLIE in her individual capacity. LESLIE is a resident of the Eastern District.

7.  Defendant, ANGELA FITZGERALD (hereinafter "FITZGERALD"), is, and at all times herein relevant was, an employee of COUNTY and upon Plaintiff's departure from COUNTY, filled Plaintiff's vacated position with the COUNTY. Defendant FITZGERALD acted within the course and scope of her employment and agency at all times herein. Plaintiff sues FITZGERALD in her individual capacity. FITZGERALD is a resident of the Eastern District.

8.      Defendant, CAROL GALL (hereinafter "GALL"), is, and at all times herein relevant was, an employee of Defendant COUNTY employed in the District Attorney's Office as an Advocate in the Victim Witness Assistance Program (hereinafter "VWAP") and, during Plaintiff's employment with the COUNTY, was a subordinate of Plaintiff. Defendant GALL acted within the course and scope of her employment and agency at all times herein. Plaintiff sues GALL in her individual capacity. GALL is a resident of the Eastern District.

**GENERAL ALLEGATIONS**

9.      To fund, in whole or in part, victims services under the supervision of COUNTY'S Victim/Witness Assistance Program, COUNTY sought grants under the Child Abuse Treatment ("CHAT") program. This program is funded through the Federal Victims of Crime Act, 1984, Reauthorization; Public Law 98-473 as found at 42 U.S.C. 10601, et seq. ( hereinafter "VOCA").

10.     The objectives of the CHAT program are to provide comprehensive treatment service to all child victims of abuse and neglect, abduction, domestic, family, school, and community violence in counties which are unfunded or inadequately funded. One of the goals of the CHAT program is to establish minimum standards of services for child abuse treatment projects in each county.

11.     The federal funding source for the CHAT program has a number of statutory mandates and requirements. The statutory authority for the federal VOCA funds for the State of California is vested with the Executive Director of the Governor's Office of Criminal Justice Planning ("OCJP").

12.     Agencies implementing this program include government and non-profit organizations. Agencies implementing the program are selected through a Request for Proposal ("RFP") process. Numerous criteria are set forth which must be met by the agency implementing the program and the selection of the agency must be made through a competitive process. By its very nature, the competitive process requires that the agencies competing to implement this program be given equal opportunity to succeed and the selection process should not be influenced by any conflict of interest.

13. In May and early June of 2004 Defendants were preparing to submit their application for a CHAT grant to the State of California. The deadline for submission of the application was in mid-June. In preparation for this application, COUNTY solicited bids from private non-profit agencies to act as the subcontracting servicing agency to provide services under the program. The COUNTY received bids from three (3) agencies: Family Service Agency (hereinafter "FSA"), Creekside Counseling Agency (hereinafter "CREEKSIDE") and New Directions of Hope (hereinafter "NEW DIRECTIONS").

14. In past years the decision as to which private non-profit agency should be awarded the contract as the Implementing Agency under COUNTY'S CHAT grant was made jointly by Plaintiff, Plaintiff's then immediate supervisor (Ben Lambert, who was succeeded in that position by Defendant LESLIE), and the then Shasta County District Attorney (MacGregor Scott, who was succeeded in that position by Defendant, BENITO).

15. In conjunction with the 2004 CHAT application, although Plaintiff had some minimal input as to the choice of which bid to accept, the decision was actually ultimately made by Defendant LESLIE, who determined to award the contract to CREEKSIDE. This decision was made several days prior to the deadline for submitting the bid applications to the State.

16. LESLIE'S direct supervisor, Defendant BENITO, sat on the Board of Directors of FSA, one of the unsuccessful bidding agencies. LESLIE determined that she would inform FSA that it was unsuccessful in its bid but that the time for submitting bids directly to the State had not expired and that FSA could, therefore, submit its bid directly to the State. Although the other unsuccessful bidding agency, NEW DIRECTIONS, could also submit its bid directly to the State within the time allowed, LESLIE determined not to inform NEW DIRECTIONS of those facts.

17. LESLIE informed Plaintiff of her decision to inform FSA it was unsuccessful and of its opportunity to bid directly with the State. She instructed Plaintiff not to inform NEW DIRECTIONS of its rights. Plaintiff protested, directly to LESLIE, LESLIE'S decision to give FSA an unfair competitive advantage over NEW DIRECTIONS by not informing NEW DIRECTIONS

-4-
COMPLAINT FOR DAMAGES
JURY TRIAL DEMANDED

of its opportunity to submit the bid directly to the State. LESLIE'S response was that she owed nothing to NEW DIRECTIONS and she continued to insist that NEW DIRECTIONS not be told.

18. Plaintiff, in protesting as stated above, reasonably believed that giving FSA this information while withholding similar information from NEW DIRECTIONS, gave an unfair competitive advantage to FSA over NEW DIRECTIONS and thereby subverted the intent and requirement of the law that the RFP process be "competitive".

19. When FSA learned that they were not to be awarded the contract, they were upset and angry and contacted employees of the Shasta County District Attorney's Office, including LESLIE and Assistant District Attorney Dan Flynn, and reminded them as to how close FSA was to District Attorney BENITO (who sat on their Board) and further informed them that BENITO would be upset if FSA was not granted the contract. BENITO and LESLIE then both went on vacation and did not return until the first week of July.

20. Shortly thereafter, FSA demanded and was granted a meeting with the employees of the District Attorney's Office who were the decision makers on the awarding of the CHAT grant contract. That meeting was set for and occurred during the later part of July 2004. That meeting was attended by Reny Noll (the Board President of FSA), Tamara Trinidad (an attorney and Board member of FSA), LESLIE, BENITO and Plaintiff (who had not been informed of the meeting until the very day of its occurrence).

21. At the above-mentioned meeting the following occurred:

    a) The FSA Board Members repeatedly stated and implied that Plaintiff was the individual who had made the decision to award the contract to CREEKSIDE rather than to FSA and inquired as to why she had made such a decision;

    b) At no time during the meeting did either LESLIE or BENITO attempt to correct the misconception of the FSA Board Members and point out that all three (3) (Plaintiff, LESLIE and BENITO) had input into the decision but that the ultimate decision was made by LESLIE, although both LESLIE and BENITO knew that to be the case;

    c)  The FSA Board Members repeatedly alluded to perceived prior problems within CREEKSIDE, NEW DIRECTION and FSA and with theirs services;

    d)  BENITO falsely stated that he had been unaware of these prior problems with CREEKSIDE, NEW DIRECTION and FSA and with theirs services;

22. After the above-referenced meeting, BENITO informed Plaintiff that he was upset with her and told Plaintiff "You knew I wanted that contract to go FSA".

23. After their return from vacation and after the above-referenced meeting, LESLIE began a campaign of harassment, intimidation, defamation, and undermining of authority against Plaintiff as set forth herein below with the knowledge, prior approval, and subsequent ratification of BENITO.

24. LESLIE became rude to Plaintiff and accusatory of Plaintiff on matters of which LESLIE had no knowledge, nor could she have personal knowledge.  For example, she accused Plaintiff of continually overstepping Plaintiff's authority on matters which occurred months and some times even years before LESLIE came to the District Attorney's Office.  She indicated it was not Plaintiff's place to offer computer programs to other counties although this was done under a prior administration and with their express approval and attacked Plaintiff for going to the City Council years previously regarding donating land for the VWAP.

25. Bi-weekly managerial meetings were held which Plaintiff, as a manager, was required to attend in order to adequately perform her job.  Those were intentionally set at times when Plaintiff could not make it because of other commitments of her job, often requiring her to be out of town. There was no reason these meetings could not be changed to a day when all members, including Plaintiff, could attend but LESLIE refused to do so and suggested that Plaintiff bring the matter up with BENITO.

26. When Plaintiff brought the matter of the bi-weekly managerial meetings up with BENITO he indicated there probably would be no reason they could not be changed.  When LESLIE learned of this she attacked Plaintiff for going directly to BENITO although she had suggested Plaintiff do so. She continued to refuse to change the meeting to a date when all, including Plaintiff,

-6-
COMPLAINT FOR DAMAGES
JURY TRIAL DEMANDED

could attend.

27. A short time after Plaintiff turned fifty (50) years of age, LESLIE commented to numerous of the co-workers, including Plaintiff's subordinates, that she sympathized that they had to work with a woman fifty (50) years of age whom LESLIE implied was moody and needed to "take a pill and chill". This substantially undermined Plaintiff's status and authority with her subordinates.

28. When these incidents continued to build up and LESLIE continued to be intentionally rude to Plaintiff and difficult to work with, Plaintiff went to BENITO to discuss the matter but he indicated he was unable to meet with her for a while. Since this was causing a considerable amount of stress with Plaintiff, she took a couple of days off work in order to recover.

29. When Plaintiff returned to work after a couple of days off, LESLIE informed Plaintiff that she expected Plaintiff to resign. Plaintiff refused and stated she had no intention to resign and had always loved her job.

30. LESLIE also continued to attempt to sabotage Plaintiff's authority with Plaintiff's subordinates by siding with Plaintiff's subordinates in disputes between the subordinates and Plaintiff without first obtaining knowledge of Plaintiff's position or side of the story on the matters. This made Plaintiff's management of her subordinates even more difficult.

31. Despite Plaintiff's request to meet with BENITO regarding the problems between her and LESLIE, BENITO avoided such meetings but, approximately five (5) weeks after first requesting the meeting, Plaintiff approached BENITO crying, indicating they were supposed to meet five (5) weeks previously and still haven't, and informing BENITO that LESLIE was making her work life intolerable. Rather than attempt to investigate and/or mediate the problem, BENITO merely indicated to Plaintiff that she should find another job.

32. Plaintiff was required to attend a work-related meeting in Sacramento in the first week of September 2004. While she was gone at the meeting, LESLIE approached Plaintiff's staff soliciting criticisms of Plaintiff (in order to attempt to find justification for disciplining or terminating Plaintiff). This further undermined Plaintiff's status and authority with her peers and subordinates.

33. When Plaintiff learned that LESLIE was soliciting criticism from Plaintiff's subordinates, she again requested a meeting with BENITO. At the meeting BENITO continued to support LESLIE and refused to take any steps to remedy the problem.

34. The Chief Assistant District Attorney, Dan Flynn, agreed to try to mediate the disputes between LESLIE and Plaintiff and to work things out but was thwarted by BENITO and thus mediation was unsuccessful.

35. Flynn then suggested that Plaintiff could report directly to him rather than to LESLIE in order to defuse this situation inasmuch as Plaintiff was a good employee and it appeared that for some reason (which may have been unknown to him at the time) LESLIE and Plaintiff could not work together. Again, BENITO refused.

36. At this time Plaintiff had approximately five (5) weeks of vacation and two (2) weeks of administrative time owing to her. Plaintiff put in for a vacation inasmuch as she was suffering stress and needed some time off. LESLIE denied the request for vacation indicating that Plaintiff had just gotten back from Sacramento and LESLIE could not believe Plaintiff was asking for a vacation. Sacramento was not vacation but work-related meetings. Denial of vacation time in such a situation was unprecedented.

37. Plaintiff discussed the denial of vacation with Chief Assistant District Attorney, Dan Flynn, who met with LESLIE and spoke to BENITO and told Plaintiff that BENITO was backing LESLIE and that Plaintiff could not have the time off.

38. At that point Flynn informed Plaintiff that if she had a line on another job she should take it because he was unable to do anything for her and it was out of his hands. Plaintiff had a doctor's appointment set for that day and Flynn told Plaintiff that when she next meets with LESLIE, LESLIE was going to give Plaintiff two (2) reprimands and that if Plaintiff was not at work after the doctor's appointments, LESLIE would be unable to give them to her. The proposed reprimands were unwarranted and pretextual and would have adversely affected Plaintiff's future employment with the COUNTY.

39. Plaintiff visited her doctor and he indicated to her that her blood pressure was

high and he took her off work for two (2) weeks.

40. Plaintiff's husband, Doug, is also an employee of Shasta County, and delivered her "off work" slip to the COUNTY and placed it in the boxes for BENITO, LESLIE and Flynn.

41. A day or two later Plaintiff received a letter in the mail telling her not to have any communication with anyone in the office while she was off. LESLIE then changed the password on Plaintiff's work telephone so that Plaintiff could not get her messages and staff was called together and told not to speak to Plaintiff.

42. At this point it became apparent to Plaintiff that Defendants were determined to force Plaintiff to quit and find another job or, failing that, to find grounds to terminate her and to continue to harass her and adversely affect her health. The situation at work had become so intolerable that Plaintiff, in consultation with her husband, decided that she would retire.

43. Plaintiff's husband delivered a letter on behalf of Plaintiff of Plaintiff's intent to retire on October 4, 2004. Plaintiff and her husband then spoke to the administrators of the County Retirement Program and found that if she waited to the end of October, she would get the benefit of the COUNTY raise and if she waited to January she would get the benefit of an additional quarter or even an additional year and that those items could make a difference of four hundred dollars ($400.00) per month on her retirement.

44. Upon learning this, Plaintiff wrote another letter saying her decision to retire was made in haste and seeking to withdraw her resignation so that she could take advantage of the enhanced retirement.

45. In the meantime, LESLIE had sent out an e-mail over BENITO'S signature to other counties and other persons indicating that from that date forward Plaintiff had no authority to represent the COUNTY in theVWAP. The tone of the letter implied that Plaintiff had either been fired or had a terminal illness.

46. BENITO rejected Plaintiff's withdrawal of her resignation resulting, therefore, in Plaintiff's constructive termination in October, 2004.

47. Following her constructive termination from the COUNTY, Plaintiff,

commencing the first week of November, 2004, began seeing private counseling patients inasmuch as Plaintiff had a degree in Family Counseling. Additionally, she saw an ad in the paper with the School District seeking a counselor and applied for that position which she obtained and commenced working at the school district in January, 2005.

48. Although Plaintiff was a graduate family counselor, she had not taken the test to become licensed and, therefore, it was required that her work be under the supervision of a licensed family counselor. Marcella Thompson (hereinafter "THOMPSON") was a licensed family therapist and agreed to act in a supervisory capacity over Plaintiff in both Plaintiff's private practice and her job as school counselor.

49. On Martin Luther King weekend of 2005, Plaintiff ran into BENITO who inquired of her how her private practice was going and where she was getting her referrals from. Plaintiff informed BENITO that there were a variety of referral sources including the VWAP and that she was also working at the schools as a counselor.

50. The following Friday Plaintiff received a message from THOMPSON who indicated that she needed to meet with Plaintiff on an urgent basis. Plaintiff could not meet with THOMPSON that day but did on the following day, Saturday.

51. At the Saturday meeting THOMPSON informed Plaintiff that she could no longer supervise Plaintiff in either position because THOMPSON had been informed by Defendant FITZGERALD that the VWAP could no longer refer clients to Plaintiff because Plaintiff was unethical and had a conflict of interest and that Plaintiff had improperly taken ten thousand dollars ($10,000.00) from one of her victim witness clients. These statements were untrue and this is the first time Plaintiff learned of these defamatory statements to THOMPSON.
FITZGERALD further told THOMPSON that this directive was coming from the top, not merely from FITZGERALD and that the District Attorney was starting a criminal investigation against Plaintiff.

52. Plaintiff informed THOMPSON that the allegations were untrue and that she needed THOMPSON to continue to supervise her so that she could continue to earn a living.

-10-
COMPLAINT FOR DAMAGES
JURY TRIAL DEMANDED

THOMPSON stated that she would like to believe Plaintiff but did not want to take the risk that the COUNTY would blacklist her. She stated Plaintiff would be permitted, however, to remain in the building if she could get a new clinical supervisor for both the private practice and the school practice. Plaintiff was later successful in getting another licensed family counselor, Patricia Bay, to supervise at her private practice. Plaintiff also was compelled to seek another licensed family counselor, Keith Manner, to supervise her at the schools.

53.  Plaintiff then received a phone call from one of her counseling clients who had earlier been referred to her from the VWAP. The client informed Plaintiff that Defendant GALL had telephoned the client's doctor, Dr. Robert James, D.C., and informed the doctor that the doctor's patient (Plaintiff's client) had given Plaintiff ten thousand dollars ($10,000.00). This was untrue and by its very nature implied a conflict of interest and unethical conduct on the part of Plaintiff who was counseling the client at that time. The client went to the VWAP and was told by GALL that Plaintiff would be in big trouble over this, again implying that Plaintiff had done something unethical or illegal. The client repeatedly informed the VWAP that it was untrue and he had not given ten thousand dollars ($10,000.00) to the Plaintiff.

54.  On or about January 20, 2005, LESLIE falsely informed her entire staff that Plaintiff had managed the Victim Witness Program for the COUNTY and that, in doing so, Plaintiff was unethical. She informed the staff that they were to have no contact with Plaintiff at all.

55.  At some time between January 20, 2005, and February 2005, FITZGERALD falsely informed certain persons at CREEKSIDE and at NEW DIRECTIONS that Plaintiff had run the Victim Witness Assistance unit in an unethical manner and had misused public funds.

56.  On or about January 25, 2005, FITZGERALD told Darcy Varnum and told various mental health clinicians that Plaintiff, while managing the Victim Witness Program, had made unethical referrals to CREEKSIDE and other mental health providers, that there was some "greasy palm" activity going on, and that the District Attorney's Office was conducting an investigation, thus implying that criminal conduct had taken place. The statements regarding Plaintiff's conduct were false.

57. On or about March 17, 2005, GALL falsely told unknown COUNTY employees that Plaintiff was stalking GALL, driving past GALL'S house, resulting in GALL'S daughter running into the street banging on Plaintiff's car window.

58. On or about March 24, 2005, BENITO admitted to Doug Gardner, Plaintiff's husband, that BENITO was aware of the conduct by county employees as outlined above. He also indicated that Doug Gardner should instruct Plaintiff to stop stalking GALL or a restraining order would be obtained. BENITO further told Doug Gardner that there was no investigation regarding Plaintiff.

59. On or about April 11, 2005, an unknown county employee falsely told Plaintiff's new counseling supervisor, Patricia Bay, that Plaintiff had "legal issues" and implied that Plaintiff had ethical problems and potential criminal problems. As a result, Ms. Bay informed Plaintiff that she no longer wanted to supervise Plaintiff in Plaintiff's private practice.

60. On or about July 28, 2005, Plaintiff was approached by Gail Coons, an individual who had volunteered services for VWAP under the COUNTY'S CHAT Grant. Coons informed Plaintiff that she had been told by GALL that Plaintiff had listed Coons on the grant as a paid employee rather than a volunteer employee and that Plaintiff was wrongly taking the money rather than paying Coons. These statements were false and again implied illegal and unethical conduct on Plaintiff's part.

61. Plaintiff is informed and believes, and thereon alleges, that at all times herein mentioned, each of the Defendants was the agent, servant, co-conspirator and/or joint venturer of each of the remaining Defendants and acted within the course and scope of said relationship and pursuant to a common plan such that each Defendant authorized, negligently supervised and/or ratified each act of each of the other Defendants and were and are responsible for the acts against and damages to Plaintiff as hereinafter alleged.

**FIRST CAUSE OF ACTION**

**(Violation of 42 U.S.C. 1983 as to Defendants BENITO, LESLIE,**

**FITZGERALD and GALL)**

62. Plaintiff refers to the allegations of paragraphs 1 through 61 above and incorporates the same as though fully set forth herein.

63. Defendants BENITO, LESLIE, FITZGERALD and GALL are sued in their individual capacity and, at all times mentioned in this Complaint, were acting under color of State law.

64. Throughout the majority of her employment with the COUNTY, Plaintiff consistently received very high performance ratings and recognition from her supervisors, peers, and others for her high performance. In mid-June 2004, Plaintiff received her last performance evaluation which was a "360 Evaluation" relying on input from all categories of persons with whom she dealt in the employment setting and Plaintiff was evaluated as "very good".

65. It is a matter of public concern that governmentally funded social programs, such as CHAT, which are intended for the treatment and benefit of children, be awarded and administered in conformity with the requirements set forth by the authorizing statutes and the rules promulgated pursuant thereto, and not pursuant to improper conflicting interests so as to avoid the potential improper expenditure of public funds and the sabotaging of the objectives of the Program.

66. Shortly after Plaintiff's protests against the conduct which she reasonably believed to be an unethical and illegal subversion of the competitive bid process of the CHAT program and after the meeting with the two Board Members of FSA, defendants, and each of them, acted in concert and embarked upon a course of conduct, as more fully set forth in paragraphs 23 through 60 herein, designed to retaliate against Plaintiff for speaking out against the improper conduct, to intimidate and coerce her into not speaking out further on the subject and to discredit her and destroy her credibility in the event that she does dare to speak out further on the subject.

67. The wrongful conduct of Defendants, as herein alleged, was done with the intent of depriving Plaintiff of her Constitutional Right to Free Speech protected by the First Amendment to the U.S. Constitution and to chill Plaintiff's Right to Freedom of Speech in talking about and disclosing the wrongdoing of Defendants.

68. As a direct and proximate result of the conduct of Defendants, and each of them,

Plaintiff has incurred and will continue to incur special damages, including, but not necessarily limited to, lost wages and salary, lost benefits (including medical), lost pensions, deferred compensation and will continue to suffer such losses for an undetermined amount of time in the future, all to Plaintiff's damage in an amount to be determined according to proof.

69. As a further direct and proximate result of the conduct of Defendants, and each of them, Plaintiff has been damaged by the loss of reputation, good will and standing in the community, severe emotional and mental distress, scorn and humiliation, embarrassment, mental anguish, and suffering, depression, anxiety, loss of enjoyment of life and a general loss of self-esteem and well being, all in an amount to be determined according to proof.

70. The acts of the individual named Defendants, and each of them, as alleged herein, were done intentionally, willfully, maliciously, fraudulently, oppressively, recklessly, and in willful and conscious disregard of Plaintiff's rights and the rights of others, thus entitling Plaintiff to punitive damages against the individual Defendants, in an amount according to proof.

WHEREFORE, Plaintiff prays judgment against Defendants BENITO, LESLIE, FITZGERALD and GALL, and each of them, as set forth below.

**(Supplemental State Law Causes of Action)**

**SECOND CAUSE OF ACTION**

**(Intentional Interference With Contractual Relations Against Defendants,**

**and Each of Them)**

71. Plaintiff refers to paragraphs 1 through 61 and 63 through 70 of this Complaint and incorporates the same herein as though fully set forth.

72. Commencing in November of 2004, Plaintiff had contracts with various private clients for providing counseling services and commencing in January of 2005, Plaintiff had a contract with the school district to provide counseling services through the school district.

73. Defendants, and each of them, had knowledge of Plaintiff's contracts with private patients and with the school district.

74.     The conduct of Defendants, and each of them, as alleged above in paragraphs 51 through 60, was done with the knowledge of the existence of said contracts and with the intent to interfere with said contractual relationships between Plaintiff and her private counseling clients, and between Plaintiff and the school district.  Defendants further knew that their intentional conduct was substantially certain to result in a disruption of the contractual relationships between Plaintiff and these personal clients and Plaintiff and the school district.

75.     The conduct by Defendants, and each of them, as set forth above, was independently wrong in that it constituted defamation in violation of public policy of the State of California as set forth in Civil Code §§46, et seq., violated Plaintiff's rights under the First Amendment of the U.S. Constitution, violated Plaintiff's rights under 42 U.S.C. §1983, et seq., and constituted retaliation for Plaintiff protesting unethical and illegal conduct which violated the rules and spirit of the CHAT program and California Labor Code §1102.5.

76.     As a result of the conduct of Defendants, and each of them, the above-mentioned contracts were disrupted and some terminated.  Further, it interfered with Plaintiff's ability to effectively provide counseling under the remaining contracts.  The disruption, termination, and interference with the contracts caused damages as herein alleged.

77.     Had Defendants' conduct as herein-above not occurred and Plaintiff's contracts not been interfered with, there is a probability that Plaintiff would have continued with her personal counseling contracts, that her contracts would not have been disrupted, and that her counseling services would not have been rendered less effective.

78.     On July 12, 2005, Plaintiff filed a claim in accordance with the California Government Tort Claim Act.  Said claim was rejected by the COUNTY with notice of said action mailed to Plaintiff on July 22, 2005.

WHEREFORE, Plaintiff prays for judgment as herein-below set forth.

### THIRD CAUSE OF ACTION

**(Interference With Prospective Economic Advantage)**

79.     Plaintiff refers to paragraphs 1 through 61; 63 through 70 and 72 through 78 as

though fully set forth herein.

80. Absent the conduct of Defendants, as herein alleged, Plaintiff had a probability of prospective economic advantage.

81. As a direct and proximate result of the conduct of Defendants, and each of them, as herein alleged, Plaintiff has lost the prospective economic advantage which she had as a private counselor.

WHEREFORE, Plaintiff prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION

### (Defamation Against All Defendants)

82. Plaintiff refers to paragraphs 1 through 61 and 63 through 70 as though fully set forth herein.

83. The statements set forth herein in paragraphs 51, 53 through 60, and each of them, were false and unprivileged and were motivated by malice and ill will.

84. All of the above statements were made in the course and scope of these employees' employment with Shasta County.

85. The statements above-mentioned are defamatory on their face and clearly expose Plaintiff to hatred, contempt, ridicule, and obloquy because they impute to her a want of ethics and illegal conduct in her employment, charge her with a crime and tend to directly injure her in respect to her profession, trade or business, because they accuse her of dishonest and unethical acts.

86. As a further proximate result of the above-described publications, Plaintiff has suffered loss of reputation, shame, mortification, and hurt feelings, all to her general damages in an amount to be ascertained.

WHEREFORE, Plaintiff prays judgment against Defendants, and each of them, as set forth below.

## FIFTH CAUSE OF ACTION

**(Intentional Infliction of Emotional Distress Against All Defendants)**

87. Plaintiff refers to paragraphs 1 through 61, 63 through 70, 72 through 78 and 80 through 86 as though fully set forth herein.

88. The conduct of Defendants, and each of them, as herein alleged was extreme and outrageous and done with the intent to cause, or with reckless disregard of the probability of causing, Plaintiff to suffer emotional distress.

89. As a direct and proximate result of Defendants' extreme and outrageous conduct, as herein alleged, Plaintiff was caused to suffer severe emotional distress, all to her detriment in an amount according to proof.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1. For special damages according to proof;
2. For general damages according to proof;
3. For damage to reputation according to proof;
4. For Punitive Damages against the individual Defendants according to proof;
5. For an award of reasonable attorney's fees under all applicable statutes or legal principles;
6. For interest according to law;
7. For such other and further relief as this court deems just and proper.

Dated: January 13, 2006                     LAW OFFICES OF ANTHONY J. POIDMORE
                                            A Professional Law Corporation

                                            By: /s/
                                            _____
                                            ANTHONY J. POIDMORE
                                            Attorneys for Plaintiff

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury.

Dated: January 13, 2006                     LAW OFFICES OF ANTHONY J. POIDMORE
                                            A Professional Law Corporation

By: /s/
ANTHONY J. POIDMORE
Attorneys for Plaintiff